DICKSON, Justice,
concurring in result and dissenting.
I concur with the majority's affirmance of the trial court judgment. But I dissent from the majority's general discussion regarding the responsibility of a principal or landowner for injuries suffered by workers employed by an independent contractor hired by the landowner or principal. In an apparent effort to provide protection for *963 landowners and other entities that employ independent contractors to eliminate or ameliorate dangerous conditions, the Court's opinion, in my judgment, goes too far and represents a significant departure from important principles of Indiana construction safety law.
The majority opinion for the Court is divided into two parts, with part I referring to PSI's vicarious liability for the acts of ACandS, and part II addressing PSI's direct liability as possessor of the premises for the conditions that caused Roberts's injuries.
In part I, the Court addresses the vicarious liability of PSI for the acts of ACandS. In this part the Court notes that there are five exceptions to the general rule of nonliability for injuries resulting from actions of independent contractors, but focuses upon the two raised by Roberts: (1) the "intrinsically dangerous" exception, and (2) the "due precaution" exception.
In part I-A, the Court acknowledges the reasoning and holding in Bagley v. Insight Communications Co., 658 N.E.2d 584, 587-88 (Ind.1995), which stated:
Our objective is no less to protect workers who may be exposed to such risks than it is to protect non-employee third parties.... Where a contractor's employer is responsible for a non-delegable duty, the contractor's injured worker should not discriminately be deprived of access to full compensatory damages but should have recourse equal to that of an injured bystander.
Id. at 588. And the Court correctly observes that this language "may fairly be read to apply to liability for acts of the contractor under the five exceptions." Op. at 958.
But the Court then proceeds to hold the opposite, broadly declaring that "in the absence of negligent selection of the contractor, an employee of the contractor has no claim against the principal based solely on the five exceptions to the general rule of nonliability for acts of the contractor." Id. at 9538. I disagree and believe our precedent in Bagley should control. I understand the Court's focus today to be generally that of shielding principals from liability for the actions of independent contractors employed to eliminate or ameliorate hazardous conditions. Discarding Bagley, however, is an unnecessarily broad stroke to accomplish this objective, which I believe to be generally attainable under existing law.
In part I-B, the Court concludes that "working with asbestos is not intrinsically dangerous such that anyone hiring a contractor to address it incurs strict liability for injuries sustained from exposure to it." Id. at 955. I strongly disagree with this assertion, believing that asbestos is precisely the sort of danger to which the intrinsically dangerous exception should apply.
This principle is expressed in Restatement of Torts, Second § 427 A: "One who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity, is subject to liability to the same extent as the contractor for physical harm to others caused by the activity." The underlying purpose of this rule is that:
[One who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity cannot be permitted to escape the responsibility for the abnormal danger created by the activity which he has set in motion, and so cannot delegate the responsibility for harm resulting to others to the contractor.
*964 Comment b to § 427 A. The illustrations following § 427 refer to injuries resulting from the non-negligent escape of lions and urban blasting operations as examples of abnormally dangerous activities.
As acknowledged by the Court, we have previously described asbestos fibers as "an inherently dangerous substance ... a toxic foreign substance ... an inherently dangerous product ... and a hazardous foreign substance." Op. at 954, quoting Covalt v. Carey Canada, Inc., 548 N.E.2d 382, 384-86 (Ind.1989). We have likewise noted that "[the normal, expected use of asbestos products entails contact with its migrating and potentially harmful residue." Stegemoller v. ACandS, Inc., 767 N.E.2d 974 (Ind.2002) (allowing action as a products liability act "bystander" by spouse contracting disease as result of contact with asbestos fibers brought home on the person and clothing of husband, a union insulator).
Dr. David Mares, who diagnosed the plaintiff's peritoneal mesothelioma, stated that, without a doubt, "it was caused by asbestos exposure." Trans. at 1208. Dr. Mares also provided vivid testimony describing the disease's deadly nature. He declared that malignant mesothelioma is a fatal disease process. "It is not curable." Trans. at 1196. The time from the date of diagnosis to the date of death in a person with malignant peritoneal mesothelioma is usually "a year or less." Trans. at 1206. Dr. Mares explained:
There are several possible ways that Mr. Roberts can be involved with this disease process. The first being recurrent accumulation of fluid in the abdomen that needs to be taken off with this [tapping] procedure ... That can be, of course, painful and limiting to one's life, to have to be tied to the hospital ... That's kind of the early progress of the disease ... Another way could be that ... the tumor itself tends to form less fluid and would instead progress by growing within the abdomen, causing pain by growth into any of the vital structures, such as the umbilical pain ... It can grow into the muscle layers. It can grow into the bones of the back [or] into the vital organs. This causes a tremendous amount of pain. The kind of pain that would require continuous infusion of medicines to control ... [T]he third possibility would be that the intestines become enveloped and, in a sense, strangulated by the tumor such that he would be unable to eat, unable to even swallow anything, and the body's own natural secretions would build up in the body. It would be the bowel obstruction pattern, where he would continuously vomit, require tubes to drain his stomach contents and his stomach's own secretions ... And that, I feel, in combination with the pain is the most horrible way one can die of meso-thelioma.
Trans. at 1208-05. Dr. Mares pointed out that Mr. Roberts's pain will be "uncontrollable" and "unbearable" and that the "best medications will not provide pain relief." Trans. at 1220.
Describing the nature of mesothelioma, pathologist Arnold R. Brody, Ph.D., explained: "Our peritoneal cavity is where some of our organs are, like the stomach and the liver and the spleen sit in the peritoneal cavity. And that is lined by a single layer of cells, the mesothelium ... And when there is cancer of those cells, those mesothelial cells, it is mesothelioma." Trans. at 1888. Professor Brody stated, "[AJll of the asbestos fiber types can cause mesothelioma ... they all are perfectly good carcinogens." Trans. at 1884. He observed that no safe level of asbestos exposure has ever been established and that "[tlhere is no level below which we *965 know it to be absolutely safe and will not cause mesothelioma." Trans. at 1429.
One of the more insidious aspects of this fatal disease is the fact that its symptoms suddenly appear often decades after a worker is exposed to asbestos. Regarding this latency period between the exposure to asbestos and the first appearance of symptoms of malignant mesotheliomas, Dr. Brody testified that the probability for the latency period to be less than 10 years is about zero; for latency periods of 10 to 14 years about 0.5%; for 15 to 19 years, still just about 3%; and for 20 years or more, 96%. Dr. Brody agreed with an estimate that the average period in these cases from initial exposure to death is about 32 years. Trans. at 1480-82.
The Court specifically notes the testimony of Dr. Michael Ellenbecker emphasizing that "when we're talking about meso-thelioma, I think it's difficult to do any activities with asbestos where you completely eliminate the hazard." Op. at 954, quoting Tr. at 2588. Asked whether there is any safe level of exposure to asbestos in the context of the risk of developing meso-thelioma, Dr. Eugene Mark answered, "I don't think there is any safe level." Tr. at 2021. Likewise, Dr. Edwin Holstein testified that there is no recognized safe level of exposure to asbestos insulation such that no mesothelioma would oceur in insulation workers. He explained, "There may be such a level at very, very, very low levels, but we don't know what it is. What we do know is that even very small exposures have caused mesothelioma in some people." Tr. at 1559. In fact, the Court itself acknowledges that "it is clear that working with any level of asbestos can be associated with mesothelioma." Op. at 956.
Thus we see that asbestos workers are extraordinarily susceptible to this insidious and virulent disease that will usually go undetected for decades but then suddenly erupt with devastating and almost inevitably fatal consequences. Elimination of this enormous risk is virtually impossible because it requires preventing every possibility of asbestos workers inhaling any asbestos fibers.
Conceding that working with asbestos can be perilous, the Court nevertheless concludes that the work does not qualify for the intrinsically dangerous exception to the rule of subcontractor nonliability because, although dangerous, "proper precautions can minimize the risk of injury." Id. at 955. As authority for this conclusion, the Court cites Carie v. PSI Energy, Inc., 694 N.E2d 729, 735 (Ind.Ct.App.1998). Carie found the intrinsically dangerous exception inapplicable, noting that "Itlhere is nothing intrinsically dangerous about generating station maintenance in and of itself," that the accident was caused by the collateral negligence of others, and that "proper precautions were not taken during the cover removal process." Id. at 734. Elaborating on the last point, and citing earlier opinions of the Court of Appeals, the court declared that "[aln instrumentality or undertaking is not intringically dangerous if the 'risk of injury involved in its use can be eliminated or significantty reduced by taking proper precautions,' " and explained that "[the proper inquiry is whether the taking of proper precautions would significantly reduce or eliminate the risk of injury." Id. at 735 (emphasis added).[1] The emphasized words, in my opinion, are of crucial importance. Otherwise this "proper precautions" rationale *966 would conflate the "intrinsically dangerous" exception with the "due precautions" exception and thus eviscerate the "intrinsically dangerous" exception altogether.
An intrinsically dangerous activity, also referred to as an "abnormally dangerous activity" in the Restatement of Torts, See-ond § 520, is therein explained as follows:
In determining whether an activity is abnormally dangerous, the following factors are to be considered:
(a) existence of a high degree of risk of some harm to the person, land or chattels of others; ,
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.
This analysis requires the full inability to eliminate the risk, not merely to significantly reduce it. In my view, this is preferable to the prevailing Indiana appellate view that the intrinsically dangerous exception does not apply to risks that cannot be "significantly reduced."
Even applying the view that the intrinsically dangerous exception is applicable where risks either cannot be eliminated, or significantly reduced by due precaution, it appears clear that the risk of contracting mesothelioma demands that working with asbestos still be deemed intrinsically dangerous. As noted above, the Restatement cites the escape of lions and urban blasting as examples of abnormally dangerous activities. Obviously, such risks can be somewhat reduced with due precaution, but they cannot be eliminated or even significantly reduced. So it is with asbestos.
The Court today asserts only that "precautions could have minimized Roberts's exposure to asbestos" to justify its conclusion that "working with asbestos is not intrinsically dangerous." Op. at 955. But minimizing is not enough. Not only must due precautions have "minimized" the risk; they must have been able to eliminate or significantly reduce it. The risk of asbestos workers contracting mesothelioma cannot be eliminated nor significantly reduced. It is the quintessential example of an intrinsically dangerous activity.
Summarizing its conclusions, the Court concludes part I in part by stating that "Roberts has no claim against PSI for activities of ACandS$ as PSI's independent contractor because (a) the injuries he suffered came from a situation he was employed to address, (b) asbestos is not 'inherently dangerous' as that term is used in the exception to nonliability for acts of independent contractors, ..." Id. at 957. It is my view that rationale (a) disregards precedent. Moreover, it is too broad and may be misapplied to any and all claims of injury to employees of subcontractors even when any one of the five recognized exceptions are clearly applicable. As to rationale (b), I strongly believe it fails to recognize the fact that working with asbestos is an intrinsically dangerous activity, the responsibility for which the principal may not delegate to a subcontractor.
In part II, the Court acknowledges the duty of a property owner to "maintain the property in reasonably safe condition for business invitees including independent contractors and their employees." Id. at 957. However, emphasizing that asbestos removal was the reason Roberts was on the PSI premises, the majority opines that the law does not support Roberts's claim *967 "to the extent it is based on PSI's knowledge of asbestos on the property and awareness that ACandS$ was not requiring safeguards." Id. at 959. In a significant amplification of premises Hability jurisprudence, the Court today announces that, henceforth, where the invitee is the employee of an independent contractor employed to remedy a dangerous condition, the occupant/owner's knowledge should be compared with that of the independent contractor, not merely the knowledge of its employee. This new rule alone should significantly provide the protection sought by the majority for the use of independent remediation contractors without the additional measures taken by the majority that I believe generally assault and undermine important principles of owner/principal liability and its resulting enhancement of construction worker safety.
I believe, however, that this innovation is detrimental to more important and established principles of responsibility and accountability in tort. The Restatement of Torts (Second), § 348 recognizes that a "possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land" only if the possessor knows or should discover and realize that it "involves an unreasonable risk of harm," should expect that "they will not discover or realize the danger, or will fail to protect themselves against it," and then fails to exercise reasonable care to protect the invitees from the danger. The word "they" refers to the injured invitee, not the invitee's employer. This obligation is qualified by Section 348 A(1), which states that the possessor is "not liable to his invitees" for injuries caused "by an activity or condition on the land whose danger is known or obvious to them, umless the possessor should anticipate the harm despite such knowledge or obviousness." (emphasis added). Section 348 A(1) thus allows accommodation for the very concern that permeates the majority opinion. Where a possessor employs an independent contractor with respect to activities or conditions on the land known or obvious to persons thereby coming onto the land, the possessor will have no liability except in those extraordinary circumstances where the possessor should anticipate harm notwithstanding the obviousness of the risk. The Restatement is clear, however, that in the latter situation, the possessor remains accountable. These principles have long been recognized. Professor Prosser explains:
[Wlhere a condition is one ... which cannot be negotiated with reasonable safety even though the invitee is fully aware of it ... the jury may be permitted to find that obviousness, warning or even knowledge is not enough. It is generally agreed that the obligation as to the condition of the premises is of such importance that it cannot be delegated, and that the occupier will be liable for the negligence of an independent contractor to whom he entrusts maintenance and repair. '
William L. Prosser, Law of Torts § 61, p. 394-95 (1971). I am opposed to the majority's new rule, permitting a landowner to abandon to independent contractors all responsibility for the risk of harm to invitees from extremely dangerous conditions on the land, thus undermining the foregoing well-established principles of responsibility and accountability under tort law.
Even with the majority's modification of the rule to provide special protection to principals employing certain independent contractors, it must be recognized that there is a limit to the landowner's reasonable reliance on the contractor. Pursuant to § 348 A of the Restatement, other courts have held that a landowner may be liable for an independent contractor's injury by dangers from known or obvious con *968 ditions if the landowner should have realized the risk that the contractor would not protect itself or its employees despite the obvious nature of the danger. For example, in Miller v. Zep Manufacturing Co., 249 Kan. 34, 815 P.2d 506 (1991), an employee was injured when he fell into a concrete pit on the landowner's property. The court affirmed a jury finding in favor of the employee, reasoning that the evidence was sufficient for the jury to find that the landowner should have anticipated and prevented the risk. Id. at 515. In Watkins v. Mt. Carmel Public Utility Co., 165 Ill.App.3d 493, 116 Ill.Dec. 420, 519 N.E.2d 10 (1988), the plaintiff worked processing crude oil stored in two large tanks constructed near an uninsulated power line. He was injured when an aluminum pole he was carrying while walking on a catwalk above the tanks touched the power line. Id. at 11-12. The trial court dismissed the complaint, but the Ilinois Court of Appeals reversed, holding that it is a jury question whether the defendant should have anticipated the risk of injury despite the obviousness of the danger. Id. at 13. In Boatwright v. Sunlight Foods, Inc., 592 So.2d 261, 263 (Fla.Dist.Ct.App.1991), an employee of an independent contractor was fatally injured in a fall from a negligently designed vinegar tank. Based on evidence that the owner designed the tank and knew of the danger, but refused to install a guardrail, the court reasoned that the jury could find the owner negligent. Id.
I respectfully contend that the Court today employs unnecessary draconian methodologies to provide protection for landowners and other entities that employ independent contractors to eliminate or ameliorate dangerous conditions. Except for genuine intrinsically dangerous activities, such interests already receive significant protection under the "due precaw-tions" exception and Restatement § 348 A(1). More significant, I submit, is the constraint intrinsic to the comparative fault allocation system itself. In the present case, for example, the jury allocated thirteen percent fault to PSI, twelve percent fault to Roberts, thirty-six percent fault to nonparty ACandS, and the remaining fault to other nonparties. This shows clear recognition of the significant role of the independent contractor, ACandS. And apart from this case, where the landowner was shown to have independently contributed to substantially increase the risk to the worker, other cases will very likely result in an even greater allocation of fault to the independent remediation contractor. Justice is better served by trusting the sound judgment of civil juries than by erecting protective judicial doctrines.
Notwithstanding my disagreements with much of the Court's discussion today regarding liability for injuries to employees of independent contractors, I concur with its conclusion that the evidence in this case was sufficient under the instructions to sustain the jury's verdict and the trial court's judgment. For these reasons, I concur in result.
RUCKER, J., concurs.

. We granted transfer, vacating the Court of Appeals Carie opinion, Carie v. PSI Energy, Inc., 715 N.E2d 853, 858 (Ind.1999), but "summarily affirmed" by footnote as to the intrinsically dangerous exception issue.